**Jean–Remy FACQ and Jennifer Huff Facq, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. C03–3851C.**

United States District Court,
W.D. Washington,
At Seattle.

Jan. 6, 2005.

Brian Gary Isaacson, Isaacson Law Firm, Don Paul Badgley, Duncan Calvert Turner, Badgley Mullins Law Group, Seattle, WA, for Plaintiffs.

Robert Patrick Brouillard, US Attorney's Office, Seattle, WA, W. Carl Hankla, US Department of Justice Tax Division, Washington, DC, for Defendant.

## ORDER

COUGHENOUR, District Judge.

### I.  INTRODUCTION

This matter has come before the Court on the parties' cross-motions for summary judgment.  Having carefully considered the papers filed by the parties in support of and in opposition to the motions, the Court has determined that no oral argument shall be necessary.  Defendant's motion is hereby GRANTED for the reasons that follow.

## II. BACKGROUND

In April 2000, Plaintiffs filed their 1999 Form 1040 income tax return, reporting $4,541,051.91 in income tax liability. Two years later, in April 2002, Plaintiffs filed a 1999 Form 1040X claiming a refund of the full amount paid. The Internal Revenue Service did not act on this claim within six months, effectively denying it. Plaintiffs filed the instant action in December 2003, seeking a refund of $4,541,051.91 for 1999.

Plaintiff Jean–Remy Facq was one of the founders of InfoSpace, an Internet and mobile technologies company. In exchange for Mr. Facq's agreement to work for a relatively low base salary, InfoSpace granted him and other employees options to purchase shares of InfoSpace common stock for a strike price of $0.01 per share. On December 8, 1999, Mr. Facq exercised his options to purchase 20,000 shares of stock for the total price of $500. The fair market value of the stock was $8,428,140. Infospace was paid $2,481,939.98 for withholding taxes. The payment of the withholding taxes was funded by a sale of stock. Plaintiffs contend that the stock sold to fund the option exercise and the payment of withholding taxes was stock from a November 5, 1999 option exercise, while the shares from the December 8, 1999 exercise were liquidated pursuant to margin calls on March 7, 2000, August 28, 2000, and November 22, 2000.

At issue in this lawsuit is whether Plaintiffs' exercise of Mr. Facq's stock options in 1999 constituted a taxable event, or whether Plaintiff should properly have been taxed when the shares were sold in 2000.

## III. ANALYSIS

### A. Applicable standards

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890 (9th Cir.1994).

"In any tax refund case, the Commissioner's deficiency determination is presumptively correct and the taxpayer has the burden of proving that such deficiency is erroneous." *Niles By and Through Niles v. United States,* 710 F.2d 1391, 1393 (9th Cir.1983) (citing *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933)). Here, both parties are in agreement that Internal Revenue Code § 83(a), entitled "Property transferred in connection with performance of services,"

applies. The relevant portion of § 83(a) provides:

(a) General rule

If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of-

(1) the fair market value of such property ... at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

I.R.C. § 83(a).

Treasury Regulation § 1.83–1(a)(1) further explains that property becomes taxable under § 83(a) once it is (1) "transferred" and (2) has become "substantially vested" in the taxpayer. Thus, the question presented for the Court is whether Mr. Facq's exercise of his options to purchase Infospace shares (1) effected a "transfer" within the meaning of § 83(a), and (2) caused the shares to become substantially vested in Plaintiffs.

The Court notes that its sister court in the Northern District of California has recently decided a case presenting an identical question of law, *Miller v. United States*, 2004 WL 2672287 (N.D.Cal.2004). Having carefully considered the case before it, the Court finds that it reaches the same conclusion as the *Miller* court.

**B. Interpretation of the Internal Revenue Code**

■ In addition to a determination of what the material facts are, the resolution of the dispute in this case depends on how the Internal Revenue Code should be interpreted. As a general rule, exclusions from gross income are to be construed narrowly in favor of taxation. *Merkel v. Comm'r*, 192 F.3d 844, 848 (9th Cir.1999) (citing *United States v. Centennial Savings Bank*, 499 U.S. 573, 583, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991)). *See also Comm'r v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949) (stating that "[t]he income taxed ... should be broadly construed in accordance with an obvious purpose to tax income comprehensively.") Here, § 83(a) is part of subchapter B, describing the computation of taxable income. Therefore, to the extent that § 83(a) exempts income from being taxed, those exemptions should be construed narrowly.

■ On a more specific note, Plaintiffs urge the Court to import the definition of "at risk" in I.R.C. § 465(b)(4) to help determine the meaning of the key phrase "no personal liability" in Treasury Regulation § 1.83–3(a)(7). Without exploring the underlying reasons for Plaintiffs' suggestion here, the Court finds that bringing § 465(b)(4)'s discussion of "at risk" to bear on the regulation is inappropriate.

■ "When interpreting a statute, we ordinarily first look to the plain meaning of the language used by Congress." *Moyle v. Director, Office of Workers' Compensation Programs*, 147 F.3d 1116, 1120 (9th Cir.1998). "When a statute does not define a term, we generally interpret that term by employing the ordinary, contemporary, and common meaning of the words that Congress used." *United States v. Iverson*, 162 F.3d 1015, 1022 (9th Cir. 1998). While it is true that courts have

imported definitions of terms from one part of the code to other parts of the code where the subject terms are not defined, this importation is always done with care. *See The Limited, Inc. v. Comm'r,* 286 F.3d 324, 337 (6th Cir.2002) (declining to import I.R.C. § 581's definition of "bank" to § 956(b)(2)(A)).

Here, there are at least two problems with Plaintiffs' urged interpretive strategy. First, § 465, titled "Deductions limited to amount at risk," deals with what deductions may be taken. This section is part of subchapter E, entitled "Accounting Periods and Methods of Accounting." Thus, the general subject matter addressed in § 465 (deductions) is the opposite of what is addressed in § 83 (taxable income). Second, by its own terms, § 465(b)(4) specifically refers to the confines of § 465— "[n]otwithstanding *any other provision of this section,* a taxpayer shall not be considered at risk with respect to [certain amounts]." (Emphasis added). In a similar case, where the section containing the desired definition expressly limited the use of the definition to that section, a court declined to import that definition to another section of the code. *The Limited, Inc.,* 286 F.3d at 337.

Here, in light of the above, and as Plaintiffs have provided no authority supporting their argument that the term "at risk" as it is used in § 465 should be used to determine the meaning of "no personal liability" in the Treasury regulation, the Court finds that it would be inappropriate to do so.

### C. *December 8, 1999 Option Exercise is a Taxable Event*

■ As the Court noted above, the question is whether Mr. Facq's exercise of his options to purchase Infospace shares (1) effected a "transfer" within the mean-

ing of § 83(a), and (2) caused the shares to become substantially vested in Plaintiffs.

#### 1. *Transfer*

Plaintiffs argue that their exercise of the Infospace options falls under Treasury Regulation § 1.83–3(a)(2), which provides that "[t]he grant of an option to purchase certain property does not constitute a transfer of such property." While the instant case concerns Plaintiffs' *exercise* of their options, not the grant of such options to them, Plaintiffs' argument is that because they used a margin loan from Hambrecht & Quist to exercise their options, they, in effect, received only another option to buy the stock.

Plaintiffs rely on the further clarification provided by the regulation: "if the amount paid for the transfer of property is an indebtedness secured by the transferred property, on which there is no personal liability to pay all or a substantial part of such indebtedness, such transaction may be in substance the same as the grant of an option." Treas. Reg. § 1.83–3(a)(6). The regulation also suggests that "the extent to which the risk that the property will decline in value has been transferred and the likelihood that the purchase price will, in fact, be paid" should be taken into consideration.

Here, Plaintiffs submit that "the debt incurred for the exercise of the option and the purchase of the shares was secured by the subject shares, pledged as collateral until such debt was paid." (Pls.' Resp. at 8.) Assuming, arguendo, that this is an accurate representation[1], the question is whether Plaintiffs had any personal liability to pay all or a substantial part of the debt secured by the shares. Put this way, it is immaterial whether Mr. Facq's exer-

---

**1.** The parties are in dispute as to whether Plaintiffs' exercise of their options was an

"exercise and sell to cover" transaction or an "exercise and hold" transaction.

cise of his options was an "exercise and sell to cover" or an "exercise and hold" transaction. Plaintiffs concede that they could have been liable for a deficiency in the event that the shares put up as collateral were insufficient to satisfy their debt. (Pls.' Mot. at 18.) This admission is significant in two ways: (1) as a concession of potential liability, and (2) as a recognition that Plaintiffs bore the risk that their Infospace shares would decline in value. Therefore, the Court finds, as did the *Miller* court before it, that "Plaintiffs bore the ultimate risk that the value of the shares would decline because they would lose either the shares themselves or could have been *required to put up other assets to satisfy the margin calls.*" 2004 WL 2672287 at *6.

The Court also agrees with the *Miller* court's consideration of the likelihood that the "purchase price" for the property is paid. The *Miller* court pointed out that "Treasury Regulation § 1.83–3(a)(2)'s express terms focus on the likelihood that the 'purchase price' for the property will be paid, rather than the likelihood that indebtedness incurred to obtain the purchase price will be paid." *Id.* Not having found any authority to the contrary, the Court finds the *Miller* court's reasoning persuasive. Under the terms of the regulation, it is immaterial *who* makes the payment, as long as the payment is made. Here, there is no dispute that Infospace was paid the purchase price for the shares.

Therefore, the Court finds that the Infospace shares were "transferred" to Plaintiffs, within the meaning of Treasury Regulation § 1.83–3(a), on the date Mr. Facq exercised his options to purchase.

### 2. Substantially Vested

Treasury Regulation § 1.83–3(b) provides that "[p]roperty is substantially vested ... when it is either transferable or not subject to a substantial risk of forfeiture." I.R.C. § 83(c) specifies:

(1) Substantial risk of forfeiture

The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

(2) Transferability of property

The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

26 U.S.C. § 83(c).

There are no facts on the record now before the Court that suggest that Plaintiffs' rights in their shares could have been revoked for any reason once the options had been exercised. As the *Miller* court pointed out, any potential loss of the actual shares due to margin calls from the broker do not constitute a risk of forfeiture, since the margin call-related loss would actually be loss due to a decline in the value of the shares. *Miller*, 2004 WL 2672287 at *7 (citing Treas. Reg. § 1.83–3(a)(6)). Therefore, the Court finds that Plaintiffs' Infospace shares were not subject to a substantial risk of forfeiture. Accordingly, the Court concludes that Plaintiffs' shares were substantially vested, within the meaning of the regulation, at the time Mr. Facq exercised his options.

## IV. CONCLUSION

In accordance with the above, the Court finds that Mr. Facq's December 8, 1999, exercise of his stock options was a taxable event because the shares purchased were transferred and substantially vested in Plaintiffs within the meaning of I.R.C. § 83. Plaintiffs have failed to sustain their burden of showing that the Internal Revenue Service's tax assessment was erroneous. *Niles*, 710 F.2d at 1393.

Therefore, Plaintiffs' motion for summary judgment is DENIED. Defendant's summary judgment motion is hereby GRANTED, and Plaintiffs' complaint for refund of taxes paid in 1999 is DISMISSED with prejudice.